Filed 4/28/21  P. v. Wilson CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>VAN OTIS WILSON,<br><br>    Defendant and Appellant. | B307536<br><br>(Los Angeles County<br>Super. Ct. No. A923178) |

APPEAL from an order of the Superior Court of Los Angeles County, Nicole C. Bershon, Judge.  Affirmed.

Ralph H. Goldsen, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Idan Ivri and Eric J. Kohm, Deputy Attorneys General, for Plaintiff and Respondent.

————————————————

In 1988, petitioner Van Otis Wilson and several confederates robbed a courier who picked up money from Wilson's codefendant, Joevone Elster's, former employer. Wilson and Leslie Holget drove away in the courier's vehicle, and the courier followed him in an off-duty police officer's vehicle. In the ensuing chase, Holget shot and killed the off-duty police officer. A jury convicted Wilson of robbery and murder.

In January 2019, Wilson petitioned for resentencing pursuant to Penal Code[1] section 1170.95. After a hearing, at which no party presented new evidence, the trial court denied Wilson's resentencing petition. The trial court concluded that Wilson was a major participant in the underlying felony who acted with reckless disregard for human life. As a result, Wilson was not eligible for resentencing.

On appeal, Wilson argues that the trial court erred in denying his petition for resentencing because the trial court did not provide him with a jury trial on his resentencing petition and because the trial court applied the wrong standard of proof at the resentencing hearing. We conclude that Wilson was not entitled to a jury trial and that even if we assume the trial court applied the wrong standard of proof, Wilson demonstrates no prejudice. We reject Wilson's argument that applying the purported incorrect standard resulted in structural error. We affirm the order denying Wilson's resentencing petition.

---

[1] Undesignated statutory citations are to the Penal Code.

## BACKGROUND

### 1. *Conviction and sentence*

In 1989, a jury convicted Wilson of the murder of George Aguilar. The jury found it to be murder in the first degree. The jury also found that a principal used a handgun within the meaning of section 12022, subdivision (a).

The jury also convicted Wilson of the second degree robbery of Masih Madani. The jury found that a principal used a firearm within the meaning of section 12022, subdivision (a). The jury also found that Wilson personally used a firearm.

Following the judgment of conviction, the trial court sentenced Wilson to a seven-year determinate term and a 26-year-to-life indeterminate term.

### 2. *Direct appeal*

In his direct appeal from the judgment of conviction, this court described the facts as follows:

"In January 1988, defendant Elster was hired as a cashier at a Shell gasoline station . . . ." (*People v. Elster et al.* (May 6, 1992, B047207) [nonpub. opn.] (*Elster*).) "At that time, defendant Elster learned the owner's brother, Masih Madani [the robbery victim], collected the station's receipts every morning and took them to the bank." (*Elster, supra*, B047207, at p. 2.) "At some point before March 28, 1988, defendant Elster solicited the participation of Lamont Wade (Wade) in a robbery; he [Elster] also asked a neighbor to contact Leslie Holget (Holget)." (*Ibid*.)

On March 28, 1988, Wade, Elster and Wilson parked across the street from the Shell Station to wait for Madani. (*Elster, supra*, B047207, at p. 3.) Elster and Wilson again waited for the courier on March 29. (*Ibid*.) "On March 30, 1988, this trio again

took up an observation post behind the Shell station with the intent of robbing the courier." (*Ibid.*) "For some reason, the trio did not attempt a robbery on this occasion." (*Id.* at p. 4.) Wade then decided that he did not want to participate in the planned robbery.

On March 31, 1988, Holget drove Elster and Carr to a location near the gas station, and "Elster explained that he used to work at the Shell station; the courier should arrive at approximately 8:00 a.m. in a blue Acura, after which they would rob him in the parking lot. Holget was armed with a .44 Magnum; Carr, with a .25 caliber handgun. Approximately 20 minutes after arriving at the . . . parking lot [near the Shell station], this group met . . . Wilson and [Terrence] Gross who arrived in" another vehicle. (*Elster*, *supra*, B047207, at pp. 4–5.) Wilson drove Gross and Wilson carried a .38 caliber handgun.

"The courier collected $1,912.59 in cash, as well as some checks; these items had been placed in a cloth bag which the courier in turn placed in the rear area of his 1986 Acura Integra. He then left the station . . . Elster directed his companions to follow the Acura, stating they would rob it on the street. It was decided the group would place one automobile in front of the Acura and one behind it when it stopped at a traffic signal, at which point they would rob the courier. Thereafter, they would abandon the Acura a few blocks from the site of the robbery. . . ." (*Elster*, *supra*, B047207, at p. 5.)

When the courier stopped at a traffic signal, "Wilson and Holget stepped out of their automobiles and walked toward the Acura, displaying handguns." (*Elster*, *supra*, B047207, at p. 6.) Wilson ordered the courier out of the Acura and Wilson and Holget drove away in the Acura. An off-duty Inglewood Police

4

Sergeant George Aguilar pursued the Acura with the courier. Aguilar was able to pull alongside the Acura and "shouted several times that he was a police officer. In response, shots were fired from the Acura." (*Id.* at p. 7.) Aguilar later died from gunshot injuries.

When apprehended, Wilson waived his constitutional rights and gave a statement. "He admitted participating in the robbery of the courier, explaining his participation had been solicited by defendant Elster." (*Elster, supra,* B047207, at p. 9.) Wilson said when Aguilar's automobile pulled alongside the Acura, Holget was driving, Wilson "told Holget the driver was pointing a .45 caliber gun at them. Holget then fired his .44 Magnum at the" automobile Aguilar was driving. (*Id.* at p. 9.)

At his trial, Wilson admitted to participating in the robbery. He admitted that he pointed his .38 caliber revolver at the courier and demanded money. "He then ordered the courier out of the Acura, after which he saw Holget enter the Acura's driver's seat. Since Gross then was driving away in . . . Wilson's automobile, . . . Wilson got into the Acura with Holget." (*Elster, supra,* B047207, at p. 13.)

"Wilson then climbed into the back seat and began looking for the money in the Acura's hatchback area. He assumed they had completed the robbery successfully; he did not pay attention to Holget's driving since he was engrossed in putting the money in his pockets and socks. As they stopped at a traffic signal to make a left turn, . . . Wilson noticed a black Trans Am turning into their lane. He saw that the driver was pointing a .45 caliber automatic at them; as he ducked, he so informed Holget. . . . Wilson then heard rapid gunfire coming from inside the Acura.

Shortly thereafter, Holget stopped in someone's driveway." (*Elster*, *supra*, B047207, at p. 13.)

### 3. *Wilson's trial testimony*

Wilson testified to the following during his trial. On March 29 and March 30, 1988, Wilson went to observe the gas station to "monitor" the gas station. Wilson was waiting for Madani. On the day of the robbery, March 31, Wilson drove himself and Terrance Gross to a location near the gas station. Wilson had a .38 chrome revolver that he had purchased two days earlier. Wilson learned that Holget and Carr also would participate in the robbery. Gross told Wilson that both Carr and Holget had guns and that "it might be more easier if we decide to do it together." After debating if there would be enough money from the robbery for all of the participants, Wilson "decided I will participate in the robbery . . . ." Wilson and his confederates then waited about 30 minutes for Madani. When Madani took longer than Wilson suspected, Wilson almost aborted the robbery. Carr then proposed that the group rob Madani on the street and everyone agreed.

Wilson pulled in front of Madani's car so it could not proceed. Wilson's confederates stopped behind Madani so that Madani could not retreat backwards. Wilson "proceeded to get out of [his] car to rob Madani." Wilson "drew [his] .38 revolver from [his] waistband, pointed [it] at Madani and ordered him out [of] the car." When Wilson exited his car he asked Madani "where the money [was]." Wilson testified that he had four rounds in his revolver. Wilson testified that he loaded it "for intimidation." When Wilson's counsel asked, "Would you have shot anybody," Wilson responded, "No, I wouldn't."

6

Holget entered Madani's car sitting in the driver seat. Wilson saw Gross drive his [Wilson's] car away and "jumped in [Modani's] car with Holget." Wilson went to the back of the car to take the money. Wilson put the money in his pocket and in his socks.

Wilson saw a man pointing a gun at the car in which he was a passenger. Wilson ducked and said, " '[S]omebody next to us [is] pointing a gun at us.' " Holget then shot Aguilar multiple times. Wilson panicked and dropped his gun during the shooting. Wilson retrieved the gun but then dropped it when he was jumping over fences trying to evade detection. Later, as he continued to try to avoid detection, Wilson put money in his anus.

Wilson estimated that the shooting occurred a mile and a half or two miles from where the robbery occurred. He estimated that the shooting occurred approximately two minutes after the robbery.

Wilson testified, "[M]y intention [was]—to rob Madani." Wilson did not discuss with his confederates "how you were going to do it" or "how much money you were going to get."

4. *Jury instructions in Wilson's 1989 trial*

The trial court instructed the jury on the definition of aiding and abetting. The court instructed the jury that: "If a human being is killed by any one of several persons engaged in the commission or attempted commission of the crime of robbery, all persons, who either directly and actively commit the act constituting such crime, or who with knowledge of the unlawful purpose of the perpetrator of the crime and with the intent or purpose of committing, encouraging, or facilitating the commission of the offense, aid, promote, encourage, or instigate by act or advice its commission, are guilty of murder of the first

7

degree, whether the killing is intentional, unintentional, or accidental."

The trial court also instructed the jury that "conspiracy is an agreement between two or more persons with the specific intent to agree to commit a public offense such as robbery, and with the further specific intent to commit such offense, followed by an overt act . . . ." The court further instructed the jury: "A member of a conspiracy is not only guilty of the particular crime that to [his] knowledge [his] confederates are contemplating committing, but is also liable for the natural and probable consequences of any act of a co-conspirator to further the object of the conspiracy, even though such act was not intended as a part of the original plan . . . ."

The court instructed the jury that it had to determine whether the murder "was a natural and probable consequence of the originally contemplated criminal objective of the conspiracy." The court instructed the jury that "[i]f a number of persons conspire together to commit robbery, and if the life of another person is taken by one or more of them in furtherance of the common design, and if such killing is done to further that common purpose or is an ordinary and probable result of the pursuit of that purpose, all of the co-conspirators are deemed in law to be equally guilty of murder of the first degree, whether the killing is intentional, unintentional, or accidental."

The trial court instructed the jury that "[e]very person who unlawfully kills a [human being] [during the commission or attempted commission of robbery] is guilty of the crime of murder . . . ." "The unlawful killing of a human being, whether intentional, unintentional or accidental, which occurs [during the commission or attempted commission of the crime] of robbery is

8

murder of the first degree when the perpetrator had the specific intent to commit such crime. [¶] The specific intent to commit robbery and the commission or attempted commission of such crime must be proved beyond a reasonable doubt."

The trial court did not instruct the jury that it had to determine whether Wilson was a major participant who acted with reckless indifference to human life.

## 5. *Evidentiary hearing on Wilson's section 1170.95 petition*

Over 30 years after his trial, Wilson petitioned for resentencing. The trial court found a prima facie case, and issued an order to show cause and held a hearing on Wilson's petition. Wilson was represented by counsel at the section 1170.95, subdivision (d) hearing. No witnesses testified.

In its tentative opinion, the trial court described Wilson as the "ring leader. He was involved at every single step of this process. He planned it and then when it didn't go right they revised their plan." The trial court also noted that Wilson pointed his gun at Madani.

The prosecutor argued that Wilson was a major participant who acted with reckless indifference to human life. Wilson's counsel argued that the key issue was whether Wilson acted with reckless indifference. Counsel contended that no shots were fired in Madani's presence. The shooting did not occur until Wilson and his confederates fled from the robbery, and Wilson did not personally shoot Aguilar. Counsel emphasized that Wilson did not tell Holget to shoot Aguilar. Counsel argued that Wilson's "mens rea at the moment . . . . doesn't rise to reckless indifference on the part of Mr. Wilson at the moment that he saw Aguilar

9

waiving a gun, and at the moment that, the split second later that Holget shot . . . ."

## 6.    *Trial court's ruling*

The trial court denied Wilson's petition for resentencing. Initially, the trial court stated that it had to look at "what kind of robbery were you planning and what was your role."  The court stated that three people "purposely ensured, A, that their guns were loaded, B, they committed a carjacking in broad daylight in the middle of a busy street.  Your client actually pointed a loaded weapon at, you know, Madani's head, and that in and of itself posed a grave risk of death, pointing a loaded weapon at someone's head."

The trial court then focused on the language of the statute, explaining:  "The statute on 1170.95(a)(3) says the showing that I have to evaluate is whether you could not be, it doesn't say could not have been, it says could not be convicted of first or second-degree murder, and then it says because of changes to section 188 or 189 made effective January 1st, 2019.  That's the language of the statute I'm left with.  And the interpretation of that statute is not were you convicted or weren't you convicted, but if the law at the time is the way the law is now could you have been convicted.  Well, actually could you.  I mean it kind of looks now, it's almost like if we had a trial today, given the facts we have, given the law that we have, could you be convicted of the charge.  And I believe under the reckless indifference and major participant . . . standard that still . . . applies to murder charges, you could be for all the reasons I said . . . ."

Next, the trial court stated that Wilson "pointed a loaded weapon at someone who [he] carjacked in broad daylight.  Your car drove in front of them to block their path.  You pointed a

10

loaded weapon at somebody's head. Your colleague who came with you had a loaded gun. You at least knew that that person had a loaded gun and that somebody else had a loaded gun. You then proceeded to drive recklessly—you were a passenger— through the street, and unfortunately somebody lost their life, and after that no aid was rendered to the person and you kept the proceeds of the incident until you were arrested."

The court further stated, "I'm looking at the facts that were proved at trial, and based on those facts, given the law that we have today, could you be—could you not have been convicted. And I believe you could be under the major participant [who acted with] reckless indifference."

At the end of its ruling, the court stated, "I want to be very clear in the language that I think that I need to find and both parties will correct me. I have found that the People have proved beyond a reasonable doubt that the petitioner is ineligible for resentencing pursuant to Penal Code section 1170.95(d)(3)." Neither the prosecutor nor defense counsel asked the court "to find anything else."

Wilson timely appealed.

## DISCUSSION

On appeal, Wilson argues that he was entitled to a jury trial on his resentencing petition. Wilson argues that even if he was not entitled to a jury trial, then the trial court erred because it did not evaluate the evidence under the beyond a reasonable doubt standard of proof as a fact finder. Wilson further argues that this purported error was structural. We disagree and conclude that Wilson was not entitled to a jury trial, any purported error in not considering the evidence as a fact finder

11

was not structural, and Wilson has failed to demonstrate that any such error was prejudicial.

## A. Background

"Senate Bill 1437 'amend[ed] the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life.' (Stats. 2018, ch. 1015, § l, subd. (f).)" (*People v. Gentile* (2020) 10 Cal.5th 830, 842.) "Senate Bill 1437 creates a specific mechanism for retroactive application of its ameliorative provisions. Section 1170.95 lays out a process for a person convicted of felony murder or murder under a natural and probable consequences theory to seek vacatur of his or her conviction and resentencing. First, the person must file a petition with the trial court that sentenced the petitioner declaring, among other things, that the petitioner 'could not be convicted of first or second degree murder because of changes to Section 188 or 189.' (§ 1170.95, subd. (a)(3); see § 1170.95, subd. (b)(1)(A).) Then, the trial court must 'review the petition and determine if the petitioner has made a prima facie showing that the petitioner falls within the provisions of th[e] section.' (§ 1170.95, subd. (c).) If so, the trial court must issue an order to show cause and hold a hearing to determine whether to vacate the murder conviction and to resentence the petitioner on any remaining counts. (§ 1170.95, subds. (c), (d)(1).) At the hearing, the prosecution must 'prove, beyond a reasonable doubt, that the petitioner is ineligible for resentencing.' (§ 1170.95, subd. (d)(3).) 'The prosecutor and the petitioner may rely on the record of conviction or offer new or

additional evidence to meet their respective burdens.' [Citation.]" (*Gentile*, *supra*, at p. 853.)

Under new subdivision (e) of section 189, "[a] participant in the perpetration or attempted perpetration of a felony listed in subdivision (a) [including robbery] in which a death occurs is liable for murder only if one of the following is proven: [¶] (1) The person was the actual killer[;] [¶] (2) The person was not the actual killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree[;] [¶] [or] (3) *The person was a major participant in the underlying felony and acted with reckless indifference to human life . . . ."* (§ 189, subd. (e), italics added.) The language is similar to the felony murder special circumstance statute. (*People v. Douglas* (2020) 56 Cal.App.5th 1, 7 (*Douglas*).)

As noted, the trial court concluded that Wilson was a major participant in the underlying felony and acted with reckless indifference to human life.

## B.   Wilson Demonstrates No Prejudicial Error at the Section 1170.95 Hearing

Wilson correctly notes the split of authority on what standard governs the trial court's review at a section 1170.95, subdivision (d) hearing. *People v. Duke* (2020) 55 Cal.App.5th 113, review granted January 13, 2021, S265309 announced that the trial court must determine "beyond a reasonable doubt that the defendant *could* still have been convicted of murder under the new law—in other words, that a reasonable jury could find the defendant guilty of murder with the requisite mental state for that degree of murder." (*Duke*, at p. 123.) *Duke* further held that this standard "is essentially identical to the standard of

13

substantial evidence, in which the reviewing court asks ' "whether, on the entire record, a rational trier of fact could find the defendant guilty beyond a reasonable doubt. . . . [¶] . . ." [Citation.]' [Citation.]" (*Ibid*.)

Other courts have rejected *Duke*'s holding that at a section 1170.95, subdivision (d) hearing, the trial court applies a standard akin to review for substantial evidence. For example, our colleagues in Division Seven of this court reasoned in *People v. Rodriguez* (2020) 58 Cal.App.5th 227, review granted March 10, 2021, S266652 (*Rodriguez*), that the trial court acts as an "independent fact finder and determine[s] whether the evidence establishes a petitioner would be guilty of murder under amended sections 188 and 189 and is thus ineligible for resentencing under section 1170.95, subdivision (d)(3)." (*Rodriguez*, at pp. 243–244, review granted; see also *People v. Duchine* (2021) 60 Cal.App.5th 798, 813 [following *Rodriguez*]; *People v. Clements* (2021) 60 Cal.App.5th 597, 615 ["[T]he plain text of the statute requires the trial judge to sit as a fact finder, not as a quasi-appellate court."]; *People v. Lopez* (2020) 56 Cal.App.5th 936, 949, review granted Feb. 10, 2021, S265974 [disagreeing with *Duke*].)

Wilson argues that because *Rodriguez* is the correct standard, the trial court erred in not applying it. The People argue that *Duke* is the correct standard, and even if *Rodriguez* applies, the trial court did act as a fact finder in finding that Wilson was ineligible for relief under section 1170.95. We conclude that whether one follows *Duke* or *Rodriguez*, no reasonable trier of fact could conclude that Wilson was not a major participant who acted with reckless indifference to human life. Wilson offered no additional evidence at the section 1170.95

14

hearing and even with the assistance of counsel in the trial court and on appeal, he advances *no* viable theory under which a reasonable trier of fact could conclude that he was not a major participant who acted with reckless indifference to human life.

### 1. *Wilson was a major participant in the underlying felony*

The following question underlies the determination of whether a defendant is a major participant: Was "the defendant's participation 'in criminal activities known to carry a grave risk of death' [citation] . . . sufficiently significant to be considered 'major' [citation]?" (*People v. Banks* (2015) 61 Cal.4th 788, 803.)

Here, Wilson's own trial testimony demonstrates that he was a major participant. Wilson testified that he purchased a firearm prior to the robbery, and took a revolver containing four rounds to the robbery. Prior to the robbery, Wilson learned that Holget and Carr also had guns. Wilson cut off Madani's vehicle, threatened Madani with a loaded gun, and ordered Madani out of his car. Wilson testified that he "drew [his] .38 revolver from [his] waistband, pointed at Madani and ordered him out [of] the car." Wilson then entered Madani's vehicle and drove off with Holget. The jury concluded that Wilson personally used a firearm in the commission of the robbery. According to his own testimony, Wilson was "willingly involved in the violent manner in which" the robbery was committed. (*People v. Bascomb* (2020) 55 Cal.App.5th 1077, 1089 (*Bascomb*).)

In the trial court, Wilson essentially conceded that he was a major participant, and his counsel focused only on whether Wilson acted with reckless indifference to human life. On appeal, Wilson does not challenge the finding that he was a major

participant. We conclude as a matter of law, based on Wilson's own undisputed trial testimony, that he was a major participant. In the words of Wilson's counsel at the section 1170.95 hearing, Wilson "had a principal and ongoing role in organizing and planning the robbery of Mr. Madani, and he was the actual lead robber."

### 2. *Wilson acted with reckless indifference to human life*

Reckless indifference to human life requires consideration of "a defendant's subjective awareness of the grave risk to human life created by his or her participation in the underlying felony." (*People v. Estrada* (1995) 11 Cal.4th 568, 578.) "To act with a reckless indifference to human life, ' "The defendant must be aware of and willingly involved in the violent manner in which the particular offense is committed, demonstrating reckless indifference to the significant risk of death his or her actions create." ' " (*Bascomb*, *supra*, 55 Cal.App.5th at p. 1087.) On the other hand, "knowledge of the possible risk of death inherent in certain felonies like armed robbery does not satisfy the reckless indifference standard." (*Id.* at p. 1088.) "[T]here is significant overlap between being a major participant and having a reckless indifference to human life." (*In re Bennett* (2018) 26 Cal.App.5th 1002, 1022.)

Courts have identified the following factors to determine whether a defendant acted with reckless indifference to human life: "[T]he defendant's knowledge of weapons, and the use and number of weapons; the defendant's proximity to the crime and opportunity to stop the killing or aid the victim; the duration of the offense conduct, that is, 'whether a murder came at the end of a prolonged period of restraint of the victims by defendant'; the

16

defendant's awareness his or her confederate was likely to kill; and the defendant's efforts to minimize the possibility of violence during the crime." (*In re Miller* (2017) 14 Cal.App.5th 960, 973, citing *People v. Clark* (2016) 63 Cal.4th 522, 618–623 (*Clark*).)

Applying these factors to the undisputed evidence shows Wilson acted with reckless indifference to human life. He was actively involved and physically present during the entire sequence of events leading to Aguilar's murder. Wilson armed himself and knew that Holget was armed. Wilson testified that he "drew [his] .38 revolver from [his] waistband, pointed at Madani and ordered him out [of] the car." Wilson testified that his gun was loaded with four bullets. Holget also drew a gun on the courier. By using their weapons, Wilson and Holget were able to enter Madani's car and drive away in it.

About two minutes after they robbed Madani, Wilson saw Aguilar, who identified himself as a police officer although the evidence was not clear whether Wilson heard that identification. Knowing, however, that Holget had a gun, Wilson then warned Holget that Aguilar was pointing a gun at their car. Instead of attempting to de-escalate this volatile scenario, Wilson hid in the back of the car stuffing the proceeds of the robbery in his socks and pockets. Once more, instead of helping Aguilar after Holget shot him, Wilson ran away and dropped his gun as he attempted to avoid detection. He then put money in his anus. Even if arguendo Wilson were not aware of Holget's propensity to violence, there was no evidence that Wilson took any steps to minimize the possibility of violence during the entire sequence of criminal events.

The evidence supports only the conclusion that Wilson acted with reckless indifference to human life. (*In re McDowell*

17

(2020) 55 Cal.App.5th 999, 1015 [defendant acted with reckless indifference to human life when he "armed himself with a knife, planned and carried out a crime with obvious risks of lethal violence, and was present at the scene but took no steps to prevent the killing"]; *Douglas*, *supra*, 56 Cal.App.5th at p. 11 [ringleader who deliberately created risks to human life, took no steps to reduce them, and expressed no remorse acted with reckless indifference to human life]; *People v. Law* (2020) 48 Cal.App.5th 811, 825, review granted July 8, 2020, S262490 [defendant involved in violent robbery who used gun to threaten victims and was at the scene of the shooting but did not stop accomplice or help victim acted with reckless indifference to human life].)

Wilson cites *no* legal authority supporting his view that he did not act with reckless indifference to human life, and we are unaware of any. As the *Bascomb* court observed: " '[W]e are not aware of a single case that concludes a defendant who personally committed a robbery, used a gun, and was present for the shooting did not meet the standard' of culpability required to" show reckless indifference to human life. (*Bascomb*, *supra*, 55 Cal.App.5th at p. 1090.) Wilson also fails to analyze the issue in accordance with the appellate guidance set forth above for evaluating whether a defendant acted with reckless indifference to human life.

Instead, his sole argument is based on an unsupported characterization of the evidence. Wilson argues, without any citation to the record: "The decision to kill was made on the spur of the moment by Holget and appellant had no opportunity to prevent it. . . . In his trial testimony, appellant denied having any contingent plan to use force against anyone." In his reply brief,

18

Wilson states, again without citation to the record, "Officer Aguilar's sudden appearance was certainly not part of the plan, and marginally foreseeable."

No evidence supports Wilson's claim that he and his confederates—three of whom were also armed—planned to refrain from using force against anyone and that Holget merely acted on his own in shooting Aguilar.  The record does not support Wilson's assertion that appellant "denied any contingent plan to use force against anyone."  Wilson and his confederates may have arguendo overlooked the possibility of an innocent bystander assisting Madani, but *no* evidence supports the conclusion that they eschewed or attempted to minimize any such potential force either to effectuate the robbery or to ensure their escape.  The method of the robbery also increased the likelihood of danger because Wilson and his confederates stopped traffic, essentially guaranteeing the presence of bystanders.  Although the confederates may not have planned for an off-duty police officer to be present, this is not a case in which Wilson and his confederates planned to minimize the risk to human life such as by carrying unloaded weapons.  (Cf. *Clark*, *supra*, 63 Cal.4th at pp. 619–622 [finding insufficient evidence to show a defendant acted with reckless disregard for human life when the defendant planned for a robbery to occur after a store was closed and to use an unloaded gun].)  There is simply no support for Wilson's argument that Holget acted contrary to a predetermined plan, nor any suggestion that Wilson eschewed violence when he directed an armed Holget towards Aguilar while Wilson was stuffing the robbery proceeds in his clothing.

In sum, even if Wilson could demonstrate that the trial court applied the wrong standard of proof—an issue we need not

19

decide—he demonstrates no prejudice under any standard from that assumed error. Wilson offers no theory to support the conclusion that he was not a major participant. Wilson's only theory to support the conclusion that he did not act with reckless indifference to human life is devoid of support in the record. Because no reasonable trier of fact could conclude that Wilson was not a major participant in the underlying felony who acted with reckless indifference to human life, the trial court properly denied his petition for resentencing.

## C. Even Assuming Arguendo the Trial Court Applied the Incorrect Standard, the Error Was Not Structural

We now turn to Wilson's argument that on appeal, he did not have to demonstrate prejudice because the trial court's failure to apply the correct standard constituted structural error.

"Structural defects requiring automatic reversal of a criminal conviction typically involve basic protections without which ' "a *criminal trial* cannot reliably serve its function as a vehicle for determination of guilt or innocence, and no criminal punishment may be regarded as fundamentally fair." ' [Citations.] These include total deprivation of the right to counsel, denial of the right of self-representation, trial before a judge who is not impartial, unlawful exclusion of members of the defendant's race from a grand jury, and denial of the right to a public trial." (*In re James F.* (2008) 42 Cal.4th 901, 914, italics added.)

The concept of structural error does not apply here because a section 1170.95 hearing is not a criminal trial. Accordingly, there is no basis to conclude that " ' "a criminal trial cannot reliably serve its function as a vehicle for determination of guilt

20

or innocence . . . ." ' " (*In re James F.*, *supra*, 42 Cal.4th at p. 914; Cf. *People v. Tarkington* (2020) 49 Cal.App.5th 892, 896, review granted Aug. 12, 2020, S263219 [rejecting argument that the failure to appoint counsel prior to summarily denying section 1170.95 petition was structural error].)

Our high court's opinion in *People v. Mil* (2012) 53 Cal.4th 400 (*Mil*), a first degree murder case, is instructive in its holding that the failure to instruct the jury on elements of a special circumstances finding was not structural error and thus subject to review for harmless error.[2] There the trial court erred when: "[T]he jury was *not* instructed that a nonkiller . . . must (1) have personally had the intent to kill or (2) have been a major participant in the commission of the burglary or robbery and have acted with reckless indifference to human life." (*Mil*, at p. 409.) *Mil* nonetheless held that the error was not structural.

In doing so, *Mil* observed that an error is structural only in a " 'very limited class of cases' " when it affects the framework in which the trial proceeds. (*Mil*, *supra*, 53 Cal.4th at p. 410.) It gave as examples of structural error "the complete denial of counsel, a biased decision maker, racial discrimination in jury selection, denial of self-representation at trial, denial of a public trial, and a defective reasonable-doubt instruction." (*Ibid.*) In addressing whether more than one omitted element in instructing the jury was structural error, *Mil* stated, "The critical inquiry, in our view, is not the *number* of omitted elements but the *nature* of the issues removed from the jury's consideration. Where the effect of the omission can be 'quantitatively assessed'

---

**2** Our high court concluded that the instructional error was not harmless in that case. (*Mil*, *supra*, 53 Cal.4th at pp. 405, 419.)

in the context of the entire record (and does not otherwise qualify as structural error), the failure to instruct on one or more elements is mere ' "trial error" ' and thus amenable to harmless error review." (*Id.* at pp. 413–414.)

Wilson states that "[i]f there was room for application of a harmless error standard in this context, it would be in the limited instance where the record on appeal conclusively established the mental state of reckless indifference." As set forth in the preceding section of our Discussion, this is just such a case and thus the effect of any error in applying *Duke* instead of *Rodriguez* can easily be " 'quantitatively assessed.' " (*Mil, supra,* 53 Cal.4th at p. 413.)

## D.    Wilson Was Not Entitled to a Jury Trial on His Resentencing Petition

Wilson argues that murder based on being a major participant in a crime and acting with reckless indifference to life is a " 'new' form of murder" that did not exist prior to enactment of Senate Bill No. 1437. He reasons from this proposition, that (1) section 1437 is not merely "a sentencing provision; and (2) he is entitled to a jury trial to determine whether he should be resentenced under a theory that he acted as a major participant in the underlying robbery with reckless indifference to human life. Wilson relies on the principle that "[a]ny fact that, by law, increases the penalty for a crime is an 'element' that must be submitted to the jury and found beyond a reasonable doubt." (*Alleyne v. United States* (2013) 570 U.S. 99, 103, citing *Apprendi v. New Jersey* (2000) 530 U.S. 466 (*Apprendi*).)

Our sister court in *Lopez, supra,* has rejected this argument explaining: "Section 1170.95 petitioners are not criminal defendants charged anew with murder and constitutionally

22

entitled to a jury trial. Instead, they stand convicted of murder, their convictions are final, and they can constitutionally be punished for murder despite the ameliorative changes to the law of murder enacted by Senate Bill No. 1437. [Citations.] Accordingly, 'the sentence-[vacatur and] modification proceedings authorized by [section 1170.95] are not constitutionally compelled. . . . Rather, [section 1170.95] represents a [legislative] act of lenity . . . . [¶] Viewed that way, proceedings under [section 1170.95] do not implicate the Sixth Amendment right to have essential facts found by a jury beyond a reasonable doubt.' " (56 Cal.App.5th at pp. 957–958, review granted.)

*Lopez* further reasoned: "[A] factual finding that results in ineligibility for section 1170.95 relief does not increase the penalty for a crime. '[I]t simply leaves the original sentence intact.' [Citation.] Accordingly, *Apprendi* is not implicated and 'the Sixth Amendment does not prohibit trial courts from relying on facts not found by a jury in determining' section 1170.95 eligibility." (*Lopez*, *supra*, 56 Cal.App.5th at p. 958, review granted.)

We agree with *Lopez*. We reject Wilson's argument that he was entitled to a jury trial and his related argument that *Apprendi* and its progeny prohibit the trial court from relying on facts not found by a jury. (Accord, *People v. Anthony* (2019) 32 Cal.App.5th 1102, 1156–1157 ["[T]he retroactive relief they are afforded by Senate Bill 1437 is not subject to Sixth Amendment analysis. Rather, the Legislature's changes constituted an act of lenity that does not implicate defendants' Sixth Amendment rights."]; *Rodriguez*, *supra*, 58 Cal.App.5th at p. 243, review granted.)

Finally, with no citation to any authority, Wilson "submits" that there is an equal protection violation because persons tried under the new law are entitled to a jury trial and he is not. Wilson has forfeited this argument by failing to cite to authority supporting it. (*People ex rel. Reisig v. Acuna* (2017) 9 Cal.App.5th 1, 38 ["appellants forfeit this point by failing to present any legal authority"].)

## DISPOSITION

The order denying Van Otis Wilson's petition for resentencing is affirmed.

NOT TO BE PUBLISHED.

BENDIX, Acting P. J.

We concur:

CHANEY, J.

FEDERMAN, J.*

_____

    * Judge of the San Luis Obispo County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.